**WORLDCOM, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**Sprint Corporation, et al., Intervenors.**

**Nos. 01–1218, 01–1229, 01–1243, 01–1255 through 01–1257, 01–1267, 01–1274, 01–1310, 01–1311, 01–1313, 01–1319, 01–1321.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 12, 2002.

Decided May 3, 2002.

Darryl M. Bradford argued the cause for Carrier petitioners and supporting intervenors. With him on the briefs were Thomas F. O'Neil III, William Single, IV, Brian J. Leske, John J. Hamill, Jodie L. Kelley, Mark C. Rosenblum, H. Richard Juhnke, John T. Nakahata, Timothy J. Simeone, Christopher W. Savage, David W.

Carpenter, David L. Lawson, Paul J. Zidlicky, Thomas Jones, Glenn B. Manishin, Genevieve Morelli, Richard J. Metzger, Brad Mutschelknaus, Richard M. Rindler, Charles C. Hunter, Catherine M. Hannan, Robert J. Aamoth, Deborah M. Royster and Albert H. Kramer. James P. Young entered an appearance.

James B. Ramsay argued the cause for State Commission petitioners and supporting intervenors. With him on the briefs were Gretchen Dumas, Ellen S. LeVine, Lawrence G. Malone, Diane T. Dean, Susan Stevens Miller, Tracey L. Stokes, Betty D. Montgomery, Attorney General, State of Ohio, Duane W. Luckey and Steven T. Nourse, Assistant Attorneys General. Carl F. Patka entered an appearance.

John A. Rogovin, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were John E. Ingle, Deputy Associate General Counsel, and Laurence N. Bourne and Rodger D. Citron, Counsel. Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, U.S. Department of Justice, entered appearances.

Mark L. Evans argued the cause for intervenors BellSouth Corporation, et al. With him on the brief were Michael K. Kellogg, Sean A. Lev, Aaron M. Panner, Scott H. Angstreich, Roger K. Toppins, Gary L. Phillips, James D. Ellis, Michael E. Glover, Edward H. Shakin, John M. Goodman, Lawrence E. Sarjeant, Linda L. Kent, John W. Hunter and Julie E. Rones.

Howard J. Symons, Sara F. Leibman and Douglas I. Brandon were on the brief for intervenor AT&T Wireless Services, Inc. Michelle M. Mundt entered an appearance.

Before: SENTELLE and TATEL, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Section 251(b)(5) of the Telecommunications Act of 1996, 47 U.S.C. §§ 151–714 (the "1996 Act" or the "Act"), directs all local exchange carriers ("LECs") to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). In the order before us the Federal Communications Commission held that under § 251(g) of the Act it was authorized to "carve out" from § 251(b)(5) calls made to internet service providers ("ISPs") located within the caller's local calling area. It relied entirely on § 251(g). Because that section is worded simply as a transitional device, preserving various LEC duties that antedated the 1996 Act until such time as the Commission should adopt new rules pursuant to the Act, we find the Commission's reliance on § 251(g) precluded. Thus we remand the case. Because there may well be other legal bases for adopting the rules chosen by the Commission for compensation between the originating and the terminating LECs in calls to ISPs, we neither vacate the order nor address petitioners' attacks on various interim provisions devised by the Commission.

\* \* \*

Due in part to the 1996 Act, local telephone service areas are now typically (perhaps universally) served by more than one LEC. The reciprocal compensation requirement of § 251(b)(5), quoted above, is aimed at assuring compensation for the LEC that completes a call originating within the same area. Although its literal language purports to extend reciprocal compensation to *all* "telecommunications," the Commission has construed it as limited

to "local" traffic only. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, 16012–13, ¶¶ 1033–34, 16015–16, ¶ 1040, 1996 WL 452885 (1996) (*"Local Competition Order"*); 47 C.F.R. § 51.701(a). For long distance calls, by contrast, the long-distance carrier collects from the user and pays both LECs—the one originating and the one terminating the call. *Local Competition Order*, 11 FCC Rcd at 16013, ¶ 1034.

In an earlier order, the Commission excluded ISP calls from the reach of § 251(b)(5) on the theory that they were indeed not "local." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter–Carrier Compensation for ISP–Bound Traffic*, 14 FCC Rcd 3689, 1999 WL 98037 (1999) (*"Initial Order"*). It reached this conclusion by applying its "end-to-end" analysis, traditionally employed in determining whether a call was jurisdictionally interstate or not, stressing that ISP-bound traffic ultimately reaches websites that are typically located out-of-state. See *id.* at 3689–90, ¶ 1, 3695–98, ¶¶ 10–12, 3703, ¶ 23 (1999). On review, we held that the order had failed to adequately explain why the traditional "end-to-end" jurisdictional analysis was relevant to deciding whether ISP calls fitted the local call or the long-distance call model, and vacated and remanded the order. *Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1, 5, 8 (D.C.Cir.2000).

On remand, the FCC again reached the conclusion that the compensation between two LECs involved in delivering internet-bound traffic to an ISP should not be governed by the reciprocal compensation provision of § 251(b)(5). *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP–Bound Traffic*, 16 FCC Rcd 9151, 9152–53, ¶ 1 (2001) (*"Remand Order"*). This decision rested, as we said, on § 251(g). Having thus taken ISP calls out of § 251(b)(5)'s reciprocal compensation obligation, the FCC proceeded to establish what it believed was an appropriate cost recovery mechanism. *Remand Order*, 16 FCC Rcd at 9154, ¶ 4. The system adopted was "bill-and-keep," whereby each carrier recovers its costs from its own end-users. *Id.*

In reaching the bill-and-keep solution, the Commission pointed to a number of flaws in the prevailing intercarrier compensation mechanism for ISP calls, under which the originating LEC paid the LEC that served the ISP. Because ISPs typically generate large volumes of one-way traffic in their direction, the old system attracted LECs that entered the business simply to serve ISPs, making enough money from reciprocal compensation to pay their ISP customers for the privilege of completing the calls. The Commission saw this as leading, at least potentially, to ISPs' charging *their* customers below cost. *Remand Order*, 16 FCC Rcd at 9153, ¶ 2, 9154–55, ¶¶ 4–6, 9162, ¶¶ 19–21.

To smooth the transition to bill-and-keep (but without fully committing itself to it), the FCC adopted several interim cost-recovery rules that sought to limit arbitrage opportunities by lowering the amounts and capping the growth of ISP-related intercarrier payments. These tend to force ISP-serving LECs to recover an increasing portion of their costs from their own subscribers rather than from other LECs. *Remand Order*, 16 FCC Rcd at 9155–57, ¶¶ 7–8. The transitional rules take effect on the expiration of existing interconnection agreements. *Id.* at 9189, ¶ 82. Finally, the Commission specified that, having carved ISP-bound calls out of § 251(b)(5)

under § 251(g), it was establishing the interim compensation regime under its general authority to regulate the rates and terms of interstate telecommunications services and interconnections between carriers under § 201 of the Act; as a result, the state regulatory commissions would no longer have jurisdiction over ISP-bound traffic as part of their power to resolve LEC interconnection issues under § 252(e)(1) of the Act. *Id.*

Two sets of petitioners now challenge the Remand Order. One, headed by WorldCom (collectively "WorldCom"), consists of competitive LECs that deliver calls to ISPs, and thus stand to lose reciprocal compensation payments. These companies contend that the Commission erred in finding that § 251(g) authorized Commission exclusion of such calls from § 251(b)(5), and that, in any event, the interim compensation rules that the FCC adopted were not a product of reasoned decisionmaking and are contrary to the Act's terms. The other group, composed of several states and state regulatory commissions, complains that the order unlawfully preempts their authority to determine the compensation of ISP-serving LECs.

\* \* \*

Section 251(g) reads as follows:

(g) Continued enforcement of exchange access and interconnection requirements.

On and after [the date of enactment of the Telecommunications Act of 1996,] each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, *information access,* and exchange services for such access *to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including*

*receipt of compensation) that apply to such carrier on the date immediately preceding [the date of enactment of the Telecommunications Act of 1996]* under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after [such date of enactment]. During the period beginning on [such date of enactment] and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

47 U.S.C. § 251(g) (emphasis added). Both sides assume that *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is applicable, so that we must defer to any reasonable Commission interpretation not precluded by the language of the statute, read with the ordinary tools of statutory construction. We agree with petitioners that § 251(g) is not susceptible to the Commission's reading.

On its face, § 251(g) appears to provide simply for the "continued enforcement" of certain pre-Act regulatory "interconnection restrictions and obligations," including the ones contained in the consent decree that broke up the Bell System, until they are explicitly superceded by Commission action implementing the Act. As the Conference Report explained, "[b]ecause the [Act] completely eliminates the prospective effect of the AT&T Consent Decree, some provision is necessary to keep these requirements in place. . . . Accordingly, the conference agreement includes a new section 251(g)." H.R. Rep. 104–458, at 122–23 (1996), U.S.Code Cong. & Admin.News 1996, 10, 134.

On a prior occasion, the Commission also framed the scope of § 251(g) in similarly narrow terms:

> The term "information access" first appears [in the Act] in sections [sic] 251(g). That provision is a *transitional enforcement mechanism* that obligates the incumbent LECs to continue to abide by equal access and nondiscriminatory interconnection requirements of the [AT&T Consent Decree] when such carriers "provide exchange access, information access and exchange services for such access to interexchange carriers and information service providers...." Because the provision incorporates into the Act, on a transitional basis, these [AT&T Consent Decree] requirements, the Act uses [AT&T Consent Decree] terminology in this section. *However, this provision is merely a continuation of the equal access and nondiscrimination provisions of the Consent Decree until superseded by subsequent regulations of the Commission.*

*In the Matter of Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 15 FCC Rcd 385, 407, ¶ 47, 1999 WL 1244007 (1999) (footnote omitted) (emphasis added).

Of course such explanatory language can't be assumed to be exclusive; legislative or agency explanations of a provision may naturally tend to focus on its most salient features. Thus, despite legislative history speaking only in terms of the Consent Decree, plainly the pre-existing "restrictions and obligations" covered by § 251(g) are *not* limited to Consent Decree obligations; the statute itself explicitly embraces preexisting obligations under a "regulation, order, or policy of the Commission." See also *Noland v. Shalala,* 12 F.3d 258, 262 (D.C.Cir.1994) ("Although the legislative history ... suggests an exclusive focus [of the statutory provision in question], the statutory language is broader and may permit [an alternative] construction."). But nothing in § 251(g) seems to invite the Commission's reading, under which (it seems) it could override virtually any provision of the 1996 Act so long as the rule it adopted were in some way, however remote, linked to LECs' pre-Act obligations.

We will assume without deciding that under § 251(g) the Commission might *modify* LECs' pre-Act "restrictions" or "obligations," pending full implementation of relevant sections of the Act. The Fifth Circuit appeared to make that assumption in *Texas Office of Public Utility Counsel v. FCC,* 265 F.3d 313 (5th Cir.2001), where it implicitly relied on § 251(g) (by quoting language from an Eighth Circuit case, *Competitive Telecom. Ass'n v. FCC,* 117 F.3d 1068, 1072 (8th Cir.1997)), in sustaining modifications of pre-Act regulations governing the access charges paid to LECs by inter-exchange carriers ("IXCs"). *Id.* at 324–25. But this assumption is not enough to justify the Commission's action here, as it seems uncontested—and the Commission declared in the Initial Order—that there had been *no* pre-Act obligation relating to intercarrier compensation for ISP-bound traffic. See *Initial Order,* 14 FCC Rcd at 3695, ¶ 9; see also *id.* at 3690, ¶ 1, 3707–3710, ¶ ¶ 28–36. The best the Commission can do on this score is to point to pre-existing LEC obligations to provide interstate access for ISPs. See, e.g., *Remand Order,* 16 FCC Rcd at 9164, ¶ 27; *In the Matter of MTS & WATS Market Structure,* 97 F.C.C.2d 682, 711–15, ¶ ¶ 77–83 (1983). Indeed, the Commission does not even point to any pre-Act, federally created obligation for LECs to interconnect to each other for ISP-bound calls. And even if this hurdle were overcome, there would remain the fact that § 251(g) speaks only of services provided "to interexchange carriers and information

service providers"; LECs' services to other LECs, even if en route to an ISP, are not "to" either an IXC or to an ISP.

Having found that § 251(g) does not provide a basis for the Commission's action, we make no further determinations. For example, as in *Bell Atlantic,* we do not decide whether handling calls to ISPs constitutes "telephone exchange service" or "exchange access" (as those terms are defined in the Act, 47 U.S.C. §§ 153(16), 153(47)) or neither, or whether those terms cover the universe to which such calls might belong. Nor do we decide the scope of the "telecommunications" covered by § 251(b)(5). Nor do we decide whether the Commission may adopt bill-and-keep for ISP-bound calls pursuant to § 251(b)(5); see § 252(d)(B)(i) (referring to bill-and-keep). Indeed these are only samples of the issues we do not decide, which are in fact all issues other than whether § 251(g) provided the authority claimed by the Commission for not applying § 251(b)(5).

Moreover, we do not decide petitioners' claims that the interim pricing limits imposed by the Commission are inadequately reasoned. Because we can't yet know the legal basis for the Commission's ultimate rules, or even what those rules may prove to be, we have no meaningful context in which to assess these explicitly transitional measures.

Finally, we do not vacate the order. Many of the petitioners themselves favor bill-and-keep, and there is plainly a non-trivial likelihood that the Commission has authority to elect such a system (perhaps under §§ 251(b)(5) and 252(d)(B)(i)). See, e.g., *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm.,* 988 F.2d 146, 150–51 (D.C.Cir.1993) ("The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)

and the disruptive consequences of an interim change that may itself be changed.' "). Thus, we simply remand the case to the Commission for further proceedings.

*So ordered.*